is Denton v. Board of Governors for the State University System of Florida. Good morning, Your Honors, and good morning to the Court. Florida's resort to hotly disputed facts drawn from outside the complaint to argue its Rule 12b6 motion confirms the District Court's error here. And beyond the Rule 12b6 problem inherent in an argument that depends on facts from outside the complaint, the facts that Florida has introduced both in the District Court and for the first time before this Court could not defeat plaintiffs' claims even at the proof stage. It cannot be harder to plead a Fordyce case than it is to prove one. And yet, under the standard Florida advances, that would be the case because plaintiffs would have to plead around affirmative defenses like educational justifiability. Florida proffers race-neutral justifications for its practices, but present discriminatory intent isn't an element of a Fordyce claim. And Fordyce itself confirms that even facially race-neutral policies can be traceable to  The questions of why Florida has treated FAMU the way it has over decades, why it has systematically under-resourced FAMU, and why it has unnecessarily duplicated programs there aren't pleading questions. They aren't questions of traceability because traceability doesn't consider intent. These questions are relevant to the Fordyce analysis, but they do not become relevant until the second stage of the Fordyce analysis, after a plaintiff pleads a prima facie case and when the defendant, the state, has the opportunity to show that the challenge practices cannot be practicably eliminated or that they are educationally sound and without less segregative alternatives. Fordyce clarifies that states have an affirmative obligation to eradicate practices traceable to segregation. That means it's not about whether discrete policies standing alone are constitutional. The question instead is whether Florida has dismantled the system that gave rise to the challenge practices. But as the allegations in the complaint show, rather than dismantle those systems, Florida has entrenched the practices arising from de jure segregation. Now, we challenge two broad categories of practices, and with the court's permission, I'd like to start with why analyzing discrete single policies around funding was part of the district court's error. We argue that Florida's overall under-resourcing of FAMU, its inequitable funding and resourcing relative to its peers, that's the challenge policy or practice. That has several components, but again, the question is not whether any single one of those components viewed in isolation is constitutional. It's whether, viewed through the lens of asking whether the state has eradicated de jure segregation, whether those practices are traceable. The district court, the Supreme Court contemplates in Fordyce this high level of generality. In Fordyce, the Supreme Court, when it was discussing the challenge policies or practices there, spoke in terms of admission standards. It spoke in terms of funding and finance, facilities and finance rather, land-grant institutions, faculty and staff, governance. The district court in the Coalition of Equality, the Maryland District Court case, similarly, it discussed funding deficiencies as a challenge practice, and then analyzed discrete components of those deficiencies. On your funding point, why are you, why, you haven't compared the funding of FAMU to all of Florida's universities, correct? Well, I think we have, Your Honor. The allegation is that post-Brown, FAMU has remained underfunded relative to its peers. That's from paragraph 159 of the complaint. And the paragraph 143 similarly alleges that Florida has chronically underfunded FAMU. But you focus on University of Florida and make comparisons. I think we focus, it's fair to say that we focus on the University of Florida when it relates to the allegations around land-grant funding, because the University of Florida is the first Morrell Act institution, while FAMU is the second Morrell Act institution. But this is not, neither FSU nor UF are the only relevant comparators here under the allegations of the complaint. Instead, the allegation is that FAMU, on both a per-allocation, per-student allocation basis and other bases, is funded lower than its peers. And so, you agree we should be looking at a per-student allocation as opposed to overall dollars because we do take into account the size of the schools? Yes, I agree. And partly these questions about per-student allocations and even how we count students, right? Those are questions that are around educational justifiability and become relevant at the second stage of the Fordyce analysis. I mean, part of what the state has done here is dispute what the per-student allocations are, which confirms that what the state is doing is not engaging with whether plaintiffs have sufficiently pled their claim, but instead is attempting to refute the facts that plaintiffs have alleged. And again, these are hotly disputed facts. We differ in terms of how we should be defining students, full-time equivalent students, for example, or what sources of funding or spending need to be considered when looking at these per-student allocations. But again, on remand, the Fifth Circuit and AERS, it similarly was examining these questions of funding at a high level of generality, talking about funding and program duplication. That broader examination of funding is consistent with the general precedent that this Court has to construe allegations in the complaint in whole, in their totality, and has to examine – it's also consistent with Fordyce itself, which directs us that traceability is not need be only to the system of de jure segregation, rather than requiring that there be specifically analogous segregation error policies that plaintiffs have to identify. And it's consistent with this Court's direction in Knight v. Alabama that courts consider challenged conduct and its effects cumulatively. Now, if we're viewing these allegations then in the right lens, it's easy to see why plaintiffs have alleged, how plaintiffs have alleged traceability. Unfortunately... Wouldn't Florida say that for all of the different funding mechanisms in place for the universities in Florida, that none of them are the policies and practices that were in place during state segregation? That for each piece of the funding mechanism, there has been reform, the policies are new, and that that's what Fordyce is saying, is that you have to look at all of the pieces and see, is that policy a vestige? But they have implemented different policies across the board for funding mechanisms. So, a few points in response to that, Judge Branch. I mean, it is true that that is Florida's argument, but the fact of the matter is that in Fordyce, the court was concerned, it didn't require continuous application. So this idea that a specific policy had to be in place continuously since the years of de jure segregation is just false. I mean, we can look at Fordyce itself, which considered challenged policies that had not come into place until several years after Mississippi had purported to end de jure segregation. This court in Knight makes the same point when discussing mission statements in the University of Alabama systems or in Alabama's public universities, that that sort of continuity is not required. And the Fifth Circuit in Ayers makes the same point. But even if continuity were required, certainly continuity is sufficient to allege traceability, but even if continuity were required, we have alleged it. And that's because we have alleged this continuous practice of underfunding FAMU, inequitably funding FAMU relative to its peers, beginning well before de jure segregation ended and continuing through today. And while it's true that that has taken on different mantles, Fordyce also tells us that the Supreme Court or that states cannot accomplish through sophisticated means what would be impermissible through less sophisticated means. I see my time is ending. I'll revisit this on rebuttal. All right. Thank you, Ms. Seals. Thank you, Your Honors. We'll hear next from Mr. Costello. Good morning, Your Honors. I'm David Costello for the Appellees. May it please the Court. It's beyond dispute that Florida's history of racial segregation is shameful. But Judge Hinkle correctly held that plaintiffs have not plausibly alleged that there are any pieces of that system that linger in Florida today. Now, I know there's much to discuss on the merits, but I did want to start with standing. And particularly, I just wanted to respond to a point that my friend has raised in the reply brief, that they are not asserting what we have called a lack of racial diversity injury and instead are asserting a claim of stigmatic harm. And for us, both of those injuries boil down to the same basic question. Have plaintiffs plausibly alleged that defendants' actions are causing white students to not attend FAMU as opposed to the many other factors that play into school choice? The reason that that's the question is that Allen v. Wright teaches in footnote 22 of the decision that stigma is one of the most important injuries in our system. But to have a stigma, the plaintiff also must have a concrete interest that is independently being infringed upon by the defendant's acts. In a segregation case, there is an easy concrete interest. There is an interest in attending an integrated school. But when the claim is not direct segregation, as in Brown, but instead is indirect segregation, as in Allen and as here, the plaintiff has to grapple with all the many other reasons why white students may be choosing not to go to a particular school, like alumni connections, familial connections. Why don't they have standing on the ground that they attend FAMU or their faculty members at FAMU or what have you, and they're being underfunded? They're not getting as much money. They're being directly discriminated against. Sure, I understand, Your Honor. So just at the start, that's different from the stigmatic harm injury. That's what my friends call in their reply brief their caliber of education injury. And we agree that that is a plausible theory of injury, no doubt. The problem is that my friends have provided no allegations to show that they uniquely suffer the harms that they say FAMU is feeling as a result of our policies. They say that FAMU has diminished curriculums and diminished facilities because of our policies, but they have not provided one allegation that shows that there's a curriculum or a program that they wanted to take part in but couldn't because it doesn't exist. But they're saying they don't have the same facilities. They don't have the same resources. I mean, it seems like you would raise the standing threshold pretty high to suggest that that's not enough. I understand the concern, Your Honor, and we want to be clear. We're not boxing Fordyce plaintiffs out here. This is a very important claim. But I do think cases like Lujan, like Clapper, like Carney, they all teach that you have to have some allegation showing that you uniquely are suffering the harms that the school, in this context, is suffering. So to give you an example, imagine that in a Fordyce claim, an English major brought a Fordyce claim challenging policies that affect the business school uniquely. I think we'd all agree that that English major doesn't have standing to challenge those Fordyce violations because that English major will never feel the hurt of the alleged Fordyce violations. They'll never come within the business school. And that's the problem here. My friends have identified only their years and their majors, but we have no idea whether there are any programs that they want that VAMU doesn't have or if there are any facilities that they want to partake in that are affected by the defendant's alleged violations. So that's the diminished caliber of injury problem. And then for their stigma claim, we think it's as simple as they haven't grappled with, just as the plaintiffs in Allen didn't grapple, with the reality that there are many reasons why people choose to go to a particular school. And we don't think it would have been hard for them to show stigmatic harm here if they had the allegations to support it. For example, if they had provided an allegation that says, look, there is a white student who got into VAMU and who would have gone to VAMU if only it had better courses or if only it had better facilities, you have a much better claim that the defendant's acts are coercing white students not to attend VAMU. But we have none of that. They have one allegation in their complaint. It says white students do not attend VAMU because of the state's policies. That's exactly the conclusory statement that Twombly and Iqbal forbid. All right. Can we move on to the merits? Of course, of course. I'm happy to turn to the merits. Let me ask you a question because I understand the district court's concerns about the case and the arguments that you all have made, but why is that relevant at the motion to dismiss stage? Why don't they get the chance to try to prove these allegations, get discovery, put on evidence, and then the court can determine whether there's actually a question of fact? Because it seems like, it does seem like, the district court was sort of weighing the evidence here a little bit in determining that there was no cause of action, that they hadn't pled enough. I understand the question, Your Honor. I think Judge Hinkle was doing exactly what Twombly and Iqbal require. You used the word weighing. I understand the intuition that we shouldn't be weighing things at the motion to dismiss phase, but I think Twombly and Iqbal changed that. Well, we shouldn't be weighing facts. We shouldn't. Well, we should. We shouldn't be weighing, right? Because you all made certain suggestions and then the district court sort of weighed the suggestions you made against the allegations in the complaint. Isn't that what happened? I don't think I dispute that, but I want to be clear about what we shouldn't necessarily be weighing. I think that you do have to weigh facts and the broad context in which the claim is brought to assess whether it is reasonable to infer that a policy that my friends have identified traces back to segregation. And I think that just stems from the way that the Fordyce standard layers atop the Iqbal standard. So the Fordyce standard says, plaintiffs have to identify policies and practices that exist today and trace them back to segregation. Iqbal says that if my friends have identified conduct that is equally likely to be lawful as opposed to unlawful, then the complaint fails to state a claim. And when you layer the standards atop each other, what that means is that plaintiffs have to show that it is, or they have to grapple with the reality that if it is equally likely that if any of the policies they identify trace to, not to segregation, but instead to modern circumstances and non-objectional current realities, then they haven't stated a plausible claim. And Iqbal explains that in assessing that question, this court should consider all of the context. It should consider judicial experience, common sense, and judicially noticeable facts like the kinds we've provided in our complaint. And I don't want to get too hung up in those facts, Your Honor. We think that those are judicially noticeable, the statistics we've provided. My friends have not disputed those in the reply brief. They come from an agency report that existed when my friends filed the complaint. But it's not just the facts we have pointed out. Their own complaint notes, as it relates to their underfunding allegations, in paragraphs 160 to 161, that Florida funds almost double the percentage of FAMU's budget compared to a flagship school like the University of Florida. And I think that reveals that the state is doing as much as it can, given financial constraints and other political realities, the push and pull of the political process, to fund its HBCU and to make up for whatever gaps there might be as a result of segregation. And what I think that reveals is simply that it is difficult to infer, or we think it's at least equally likely, that any funding practices that exist today trace to modern circumstances rather than 60-year stale, segregated animus. And I think as well, Iqbal does a lot of work here in explaining that the court should be considering broader context and weighing the strength of my friend's allegations against that context. Because in Iqbal, you had a discrimination claim. A plaintiff who was an Arab Muslim said that the Bureau of Prisons was discriminating against Muslims based on their race and their religion and its housing practices. And the court said, look, we're going to consider the broader context in which this claim is brought, including the fact that it was brought shortly after 9-11. And the court said, it is simply more likely, it uses the words more likely, that the Bureau of Prisons actions trace not to animus, but instead to legitimate national security concerns. That's all Judge Hinkle did here. He concluded that it was more likely that any of the policies my friends identify trace not to segregation, but instead to modern realities. And I think as well, the context that this court should be considering is the reality. Let me stop you for just a moment. I mean, there are some allegations in the complaint that are troubling. I mean, we've got sort of this history that leads up. There are repeated sort of settlements as late as 1998, I guess. Why isn't that enough to at least get past the pleading stage? Sure. So I want to directly respond to the 1998 agreement you referenced and then explain the broader context. So we don't dispute that those allegations are some allegations. We just don't think that they're particularly probative allegations. That report is 30 years old. As time beats on, it becomes more likely that decision makers who are accorded a presumption of good faith are complying with the Constitution equally, and I think most importantly. It's 30 years old, but it's also part of a pattern that's been or at least alleged to have gone on for decades. So, you know, the fact that it's 30 years old doesn't really seem to weigh very heavily in terms of the distance where you're talking about something that's been going on for over 100 years, right? I understand, Your Honor. I think two points. One, just to respond to the time point, I think Freeman versus Pitts simply recognizes the reality that under black letter, excuse me, causation principles, that as time beats on, it just becomes harder to assess that modern action is tracing back to a particular bout of animus. But more importantly, Your Honors, I just don't think that the OCR allegations are all that probative because we provided hundreds of pages in a report explaining how we complied with our partnership agreement. OCR has never refuted those allegations. And I think you have to also look at the OCR allegations against the broader backdrop in which this claim is brought. As we know in the briefs, Florida is 60 years removed from segregation. And Freeman versus Pitts teaches that it just becomes harder and harder to trace modern state action back to the segregation era. And when you combine that with the fact that modern decision makers are accorded a presumption of good faith in complying with the Constitution, we think that cases like this court's en banc decision in Johnson make clear that it's just very difficult for a plaintiff to rule out that the obvious alternative explanation that any disparities that exist today are attributable to modern decisions and not animus, but modern analysis. When you have a consistent pattern, it's not like there's been a point in a period in which somehow FEMU has gotten more funding than some of other Florida's universities, at least as has been alleged. What's been alleged is that it's been a consistent pattern of underfunding. So I guess I just have trouble seeing your argument as to why it's so difficult for the plaintiffs to meet their burden. I have the motion to dismiss staged to show that, yes, this is something that likely A few responses, Your Honor. First, of course, I push back on the idea that FEMU does not receive more funding than some universities. We provided judicially noticeable facts that show that it does. And in fact, it receives a whole lot more in per-student funding than most of our universities, $4,000 more than UF, $3,000 more than Florida State. But putting that aside, I think... Let me stop you for a second because I do think that that is something we have to talk about. I mean, their response to that is, well, Florida kind of played with the numbers. Those numbers aren't real. And that is a question of fact. And we are alleging different numbers that we think are based on the actual facts. Why don't they get to try to prove that instead of having us just decide, well, Florida's numbers must be right? I mean, we would have to choose Florida's numbers over the numbers they allege. And that just seems inappropriate on a motion to dismiss. I take the concern, Your Honor. A few responses to it. First, I want to make clear. We think that you should affirm, regardless of the broader context, the facts that you're discussing. We think that we win no matter whether you consider those. But we think that you should consider them. This Court has reams of precedent that says that it is appropriate to consider judicially noticeable facts at the pleading stage. And we think that makes all the sense. I'm not saying we don't consider them. But the problem is, so they're judicially, let's say that we consider them. It's judicially noticeable for the fact that that's what Florida says the numbers are. It's not judicially noticeable for the fact that that's, in fact, what the numbers are. Do you know what I mean? Yeah, I do. I think this Court has assumed that when numbers come from an agency report that is published, and my friends aren't disputing those numbers, I think it's assumed that that is a judicially noticeable fact. I don't think it's anything other than that we recognize that that's what the state says it is. But they're contesting that that's accurate. So that's where the problem comes in, at least on a motion to dismiss. I take the point, Your Honor. I think I'll make one last crack at the funding stats and then move on. I think that here they're not really disputing that, at least in the pleadings. We provided statistics of the 2022 to 2023 year, and I don't think their per-student funding statistics come from that year. I think it comes from 2019. And I do think that this Court can reject, obviously, incorrect statements. If a plaintiff comes in and alleges that the sky is red, the Court can reject that because the sky is blue. I agree, but the problem is I don't have any independent—I can look at the sky and confirm that it's not red. But I have no way of independently assessing whether the numbers that Florida is providing are correct. They may well be. I'm not suggesting that they're not. But that's not the inquiry at the motion to dismiss stage. I take the point, Your Honor. If I can take a step back, because I know I'm running out of time, I do want to just make a broader point about the funding claim. So my friends here aren't doing what many Fordyce plaintiffs do, where they identify a discrete policy, like the ACT policy in Fordyce, and trace it back to segregation. That was an easy case. The policy was definitely enacted during segregation, and it was just allowed to fester well into the future. What they're doing is trying to use disparities to identify unspoken policies, unspoken funding practices that have existed throughout time. And we're not saying that's impossible, but it's certainly a lot harder to do. Many a discrimination claim has been dismissed because it only provided disparate impact evidence. And I think the question for this court at the motion to dismiss phase, and also was the question for Judge Hinkle, is whether it believes the disparities are so gross that it overcomes all of the broader context we've provided, and suggests that it is not equally likely that the modern decisions trace, or excuse me, that the policies today trace to modern decisions, and instead that it's more likely that it traces to segregation. And we don't think that the complaint met that burden. All right. Thank you very much, Mr. Costello. We'll hear again from Ms. Seals. Thank you, Your Honors. With the court's permission, I'm going to endeavor to answer some of the questions that were directed to Mr. Costello. And I'll start with the standing issues. We think that for many of the reasons that Judge Rosenbaum pointed out, that we've satisfied the injury in fact necessity. But one thing I will point out is that we alleged, as Mr. Costello acknowledged, each plaintiff's year and major at FAMU. And in particular, we alleged that Mr. Harris is enrolled in FAMU's engineering program, and Ms. Denton is enrolled in FAMU's pharmacy program. Now, the complaint is replete with specific allegations about how FAMU's treatment from Florida has affected those two programs in particular. And as an example, I'll direct the court to paragraph 90, which discusses specific promises that defendants agreed to in the 1998 partnership agreement with respect to those particular programs. As it relates to the OCR report, whether Florida has in fact complied with the OCR's obligations, again, is a hotly disputed fact here. We allege that they have not. They insist that they have. But either way, that is a fact question that can only be resolved at the motion to dismiss stage, unless there be, or excuse me, cannot be resolved at the motion to dismiss stage. Unless there be any doubt about this, we allege specifically at paragraph 91 that defendants have not complied with the partnership agreement. At paragraph 92, that FAMU continues to lack program distinctiveness. That Florida has failed to remedy or correct FAMU's chronic underfunding. That it has failed to develop FAMU's campus facilities and infrastructures. And while the OCR has not confirmed that Florida, or has not shown that Florida was not in compliance, not allege that Florida is in an ongoing violation, in paragraph 24 we also allege that the OCR has not confirmed Florida's compliance. Now, all of those allegations are facts that support the conclusion that what Florida was doing in 1998 was traceable to segregation. And because those facts remain unchanged, as alleged in the plaintiff's complaint, that same conduct is traceable to segregation. I also want to correct a fact from Fordyce on the record. I'm reading from page 505 U.S. 734. The district court discussing the admission standards that the Fordyce plaintiffs were challenging noticed that the present admission standards derived from policies enacted in the 1970s. And so there again, while Mississippi had used some ACT relevant, let's call it, admissions policy prior to the end of de jure segregation, the policy that was actually at issue when it was before the Supreme Court had changed. In fact, it had changed multiple times, and yet the Supreme Court said it remains traceable to segregation. That is akin to the facts we have here. The methods by which Florida has underfunded FAMU have changed, but the same result remains true. Now, lastly, I'll address this question of obvious alternative explanations. The obvious alternative explanations contemplated in cases like Twombly, Iqbal, and this Court's authority in Doe v. University of Sanford, or Sanford University, cannot be based on facts not alleged in the complaint, and certainly not on facts that are external to the complaint and purport to contradict the complaint's allegations. Twombly proves this point. The obvious innocent explanation of independent follow-the-leader conduct was an inference from the facts pleaded in the complaint about defendants' parallel behavior, but Florida's arguments about population growth and program demands and per-student spending don't do rely on facts drawn from outside the complaint. We can consider facts drawn from outside the complaint, but they'd have to be judicially noticeable that, you know, we can confirm for ourselves are correct, or they'd have to be, you know, something that is referred to, I guess, in the complaint and is attached in the answer, or something of that nature. Absolutely, Your Honor, but the data on student populations and demographics, as you've observed, aren't obvious facts. They're not obviously discernible facts that are of the sorts that a court would typically take judicial notice. They're not matters of common sense, and for that reason, it was error to examine them. All right. Thank you, counsel. Thank you, Your Honor. Appreciate the arguments on both sides.